MEMORANDUM.—During the last vacation, Chancellor KENT having arrived at the age of sixty, NATHAN SANFORD, Esq., counsellor at law, was appointed his successor. Chancellor SANFORD's commission bears date the 1st day of August, 1823.

JOSEPH SPENCER, Esq., Senator, died shortly after the close of the April session, 1823.

SAMUEL BEARDSLEY, Esq., Senator, having been appointed District Attorney of the United States, for the Northern District of New York, resigned his seat in the senate, during the last vacation.

---

WILLIAM SEYMOUR, Appellant,
*against*
ELIZA ANN ELLISON & others, heirs of THOMAS ELLISON
deceased, Respondents.

SEPT. 11, 1823. This cause being called in its place on the calendar, the Hon. S. R. Betts, Judge of the second Circuit, stated to the Court that he had been originally con-

*A circuit judge will not be allowed to act as counsel*

ALBANY,
Sept. 1823.

Seymour
v.
Ellison.

cerned for the respondents; and had argued for them in the
Court of Chancery, where he was their only counsel; that
on his appointment as Circuit Judge, Mr. JOHN WELLS*

---

*SKETCH OF THE LIFE AND CHARACTER OF MR. WELLS.

in the court of
errors.
Whether an
attorney, coun-
sellor, &c.,
holds,        as
such, an *office*
or     public
trust,    within
the   meaning
of the 7th sec-
tion of the 5th
article of the
constitution?
Quere.

It is by no means the least testimony to the high stand which the late
John Wells, Esq., occupied at the bar of this state, that his death deranged
and shortened, in a very considerable degree, the calendar of the present
session. Repeated applications were made and granted for the postpone-
ment of arguments to the next term, with a view to the preparation of other
counsel. Upon making one of these motions, Mr. B. F. Butler took occa-
sion to bestow a brief and extemporary, but beautiful and appropriate eulo-
gium upon the memory of this distinguished advocate. The bar of Albany,
and those attending Court from different parts of the state, assembled at the
Court room in the Capitol, (the late Chancellor Kent in the chair,) and, on
motion of the late Chief Justice Spencer, resolved to wear the accustomed
badge of mourning for thirty days. A similar meeting was holden, and simi-
lar resolutions passed by the bar of the city of New York; and the obituary
notices of the day abounded with very just remembrances of Mr. Wells'
worth and genius. He was indeed the pride of our bar; and I need make
no apology for occupying this place in presenting his surviving brethren of
the profession with such particulars of his life and character as have come to
my knowledge.

John Wells was born on the farm now owned by Mrs. E. Davis, about
one-half mile south of the present village of Cherry Valley, in the county of
Otsego, in this state. The accounts as to the time of his birth, which I have
been able to obtain, differ, between 1769 and 1770. The surrounding coun-
try was then a wilderness. During the war of the revolution, which shortly
followed, the settlement where he was born took its full share in the horrors
and cruelties of Indian warfare; and has recently been distinguished by
lying in the neighborhood which Mr. Cooper selected as the scene of his
beautiful novel, "The Pioneers." Wells' paternal grand parents were
both natives of Ireland and formed a part of a little band of colonists, who,
several years before, penetrated the then extensive wilds of that region,
and settled in the Valley where the village now stands. His maternal
grand-father was the Rev. Mr. Dunlap, who came also from Ireland with
the colonists.

His father, Robert Wells, owned a farm in Cherry Valley, on which he re-
sided in 1778, with his wife, by whom he had five children, John being the
second. These, together with an unmarried brother, John, and a maiden
sister, Jane, composed his family, who, with him, were the only descendants
of the paternal grand-father, that bore the name of Wells.

During the summer of that year, the indications of a descent from the
savages were so numerous and striking, that the father became seriously
apprehensive for the safety of his family; and he accordingly removed
them to Schenectady, as a place of greater security. But, in the autumn,

had been engaged as counsel, the melancholy news of whose death had just been received. In consequence of this event,

his fears subsiding, they returned, and arrived at the farm on the 11th of November, with the exception of his son John. He had some time before been placed by his father at school in Schenectady ; and having become much engaged in his juvenile studies, and being moreover a great favorite of his aunt Eleanor Wilson, with whom he boarded at that place, it was determined that his progress as a learner should not be interrupted, and he was left to continue his attendance at school. It was probably owing to this circumstance, that he survived the conflagration and murders which soon after desolated the neighborhood of his birth.

His father's family, with several of his neighbors, who had been driven abroad at the same time, and for the same cause, had been lulled into a fatal security by those false appearances which their aboriginal enemies knew too well how to practise ; and on the 11th November, 1778, almost every family resident at the Valley, had thus been lured to return within reach of the tomahawk. During the same month of November, and but a few days after Wells' family had reached the Valley, the celebrated Brandt, learning that the harvest of his vengeance was full, seized the opportunity to effect a descent which he had for a long time meditated. This chief, with one of the Butlers, at the head of a party of savages and their British allies, advanced upon the Valley in the night ; and the connections of young Wells were among the first who fell victims to their fury. All his relations, resident at the farm, were murdered ; Mrs. Dunlap, his maternal grand-mother, then living at the Valley, shared the same fate ; and her husband, with other members of her family, were taken prisoners. His paternal residence was burned to ashes, and the whole settlement plundered and finally destroyed. Young Wells had a brother Samuel, who was older than himself, by about two years, Robert and William who were younger, and a sister Eleanor, aged about five years. His youngest brother was not more than six months old. Indeed, the massacre of Cherry Valley affords one of the most awful illustrations of the rule which governs Indian warfare : " The indiscriminate destruction of all ages, sexes and conditions."

Cut off at this early age from the tenderest attachments of life, and left (like Logan) without one living mortal who was naturally and immediately interested in his fate, young Wells would have been, either abandoned to poverty and wretchedness, or bent down to the ordinary drudgery of life, had not his warm-hearted and affectionate aunt, Mrs. Wilson, interposed in his behalf, and formed him to a higher destiny. For his future prospects in life, she saw him thrown entirely upon her friendship and resources ; and though I cannot learn that the latter were very ample, he found the former not of that sunshine character to be dissipated by the dark cloud which had gathered over his fortunes. Through her exertions, which were, of course, indulged and aided by her very kind and generous husband, he enjoyed the best opportunity for acquiring an education which the country then afforded.

the respondents were without counsel ; and he submitted whether it was proper for him to argue their cause in this Court.

---

He continued several years at the grammar school n Schenectady, whence his aunt Wilson removed to Long Island, where he studied with the Rev. Mr. Cutting, of Jamiaca. He was afterwards at school in New York and at Newark (New Jersey,) at which last place he finished his studies preparatory to entering college. He pursued his collegiate course at Princeton, where he graduated in 1788, having an oration assigned him as his part in the commencement of that year. He took both the degrees of A. B. and A M. at this college.

Though of an age, at the time, not fully to realize the appalling story of Brandt's descent, and the fate of his family and neighborhood, yet accompanied as it was by scenes of similar cruelty, occurring throughout the whole period of the revolution, the mental wound which he had received was deepened by the dreadful associations continually brought back to his memory ; and the recollection of his early loss finally made a permanent impression upon his mind. His health not being the best, and his struggles to excel as a scholar unremitted and severe, these causes combined, gave him, at one time, an air of melancholy and premature decay. Just before the close of his studies at Princeton, his friends entertaining serious apprehensions that he was in a hopeless decline, he left college, for a short time, pursuant to their advice, with a view to recruit his health. The experiment succeeded in a very considerable degree ; and he was enabled shortly after to return, and complete his course of classical studies.

After graduating, he must shortly have entered upon his clerkship ; for his license as attorney was signed in 1791. This clerkship, together with the professional studies accompanying it, he pursued principally with Mr. Edward Griswold, then in full practice as attorney and counsel in the city of New York. Mr. Griswold, some time since, retired from business and now resides at Hempstead, in Queens county, (L. I.) He had arisen to very high reputation in his profession. As a proof that he eminently deserved this reputation, it is enough to mention, that after a retirement of several years, he is still sought out and consulted with the greatest advantage and deference, by some of the most eminent counsel in the city of New York ; and this too upon the most intricate heads of the common law Col. Burr lately mentioned to me that Mr. Griswold was the only man he ever saw who loved the black-lettered lore of the common law for its own sake ; and Mr. Wells, in the full zenith of his reputation, always spoke of the professional habits and acquirements of his early tutor and friend, in terms of the highest respect. The example alone of such a man must have been of very great advantage to his pupil ; and I am told, that in one respect, at least, there was a remarkable similarity between them : This was in a most powerful and singular habit of mental abstraction, which enabled them to sit down in the midst of their families, or a crowd

Root, President.    This question will depend on the con-   ALBANY.
struction of the seventh section of the fifth article of the   Sept. 1823.

Seymour
v.
Ellison.

of company, separate themselves from the sports, or the business, or the
noise around them, and insulated and deaf to every thing that was passing,
pursue their studies equally unconscious of any thing like interruption, as
in the deepest retirement of the closet.

On concluding his clerkship, Mr. Wells was thrown upon his own resour-
ces; and these were nothing beyond his profession.    He immediately
opened an office at a room in Pine street, New York; but though the stores
of legal knowledge, which he had laid in during his clerkship, must have
been more ample than usual, his industry great, his attendance upon his
office constant; and the execution of what business was committed to his
hands, faithful; yet, absolutely precluded from the more splendid labors
of the forum, by lacking the degree of counsel, wanting in connections,
and those friends who could successfully take any immediate interest in his
professional success, and located among a large number of attorneys, who
had in a measure monopolized the management of those suits which are the
most valuable to this class of the profession, it is not singular that during
the time which intervened between his first and second law degree, his
prospects should have been discouraging.    His business was accordingly
very limited; affording him but a scanty livelihood.    But he was not yet
so far disheartened as to relax in his studies; and he came to the bar, af-
ter the ordinary term of practice as an attorney, well prepared for the
higher duties of the profession.    His license as counsel was signed in 1795.
He still continued his practice in Pine street, his business receiving some
trifling accessions, but not to an extent which would be, in the least, flat-
tering to the most sanguine temper; and, for several years afterwards, he
pursued the humble avocation of a mere collecting attorney under very dis-
couraging prospects.

The step was deemed a hazardous one by his acquaintances, when he
added to his other expenses by undertaking the charge of a family in the
city of New York, where, even at that early day, the maintenance of a
rank and appearance necessary to command respect, required means far
beyond his reach.    The anxiety to fulfil an early matrimonial engagement,
seemed, therefore, to have got the better of his prudence, when in 1796, he
intermarried with Miss Lawrence, daughter of Mr. Thomas Lawrence, of
Newtown, Queens County, (L. I.)    This respectable lady, though not por-
tionless, did not bring an accession to Mr. Wells' means of living, which
would have prevented his future embarrassment under a less fortunate
turn of his prospects, than afterwards followed.    But she brought him what
was more important: an intelligence; evenness of temper; patience and
fortitude, which enlightened, sustained and smoothed his passage along an
obscure and rugged path to fortune and eminence; illumined the gloomy
period of adverse vicissitude, and cheered his rising hopes with the smile of
sympathy and affection

constitution.   I mention the ground upon which the deci-
sion should, in my opinion, be placed, with a view that the

There is nothing in Mr. Wells' history, manifesting that precocity of
intellect, or those intuitive off-hand powers at the bar, which has produ-
ced so many instances of premature and rapid elevation, in the morning
of manhood.   Indeed, these are, in general, but equivocal arguments for a
well earned and stable reputation.   Too often does such a genius blaze
forth with a fire and imagination sustained by very scanty materials, and
exhibiting but a short-lived beauty.   It glides before us like a meteor along
the sky, till exhausted by the excess of its own brilliancy, it sinks in dark-
ness, and is extinguished forever.

It is remarkable, that with Mr. Wells, possessing the strength which he
afterwards exerted, not only the ordinary duties of his profession, but even
his legal studies should have been rather a matter of necessity than choice.
He has frequently been heard to declare, that previous to 1804, a snug farm
and five hundred dollars would have separated him forever from his pro-
fession.   He was attended with a modesty, a diffidence, an unassuming tem-
per, which he overcame with the greatest difficulty; and it was with pain
and reluctance that he commenced his career in the more public walks of
his profession.   That he entertained serious thoughts of abandoning it for-
ever, between the years 1801 and 1804, there is little doubt; for it was dur-
ing this period that he sought for and obtained the post of assistant editor to
one of the newspapers in the city of New York.

Those warm political contests by which our country was distinguished
during the period of his more retired labors, among the choice spirits
which it called into action, did not leave Mr. Wells unemployed.   His pen
had been much engaged in the defence of his political friends and their
measures, as well as in severe criticisms upon the measures and men of
the adverse party, in the course of which he had produced several of the
most respectable essays with which the newspapers of the day abounded.
Few of these are preserved, (an event perhaps not to be regretted) and
they were in no other respect useful to him than as exercises in composi-
tion.   In this point of view they were much more so than is usual, from
the hasty manner in which they are produced.   But with him, having
considerable leisure, and being determined to make them a source of im-
provement, he was able to bestow all the attention of an Addison upon
the style of his productions.   Almost the only flattering distinction which
he had received from any of his party arose from this cause: The late
General Hamilton, having read in the newspaper some very fine anony-
mous articles, traced the authorship to Mr. Wells.   On this occasion, I am
told, he ascertained his residence, sought him out, and complimented him
for the genius he had displayed in the character of a political essayist.
This flattering attention from the leader of his party, who was himself
truly a model of fine writing in the same department, probably strength-
ened Mr. Wells' determination to turn editor.   The employment afforded

question whether the Chancellor and Judges can act as counsel, may be definitively settled. The proposition of

him a probable relief from the pressure of poverty; and he believed himself more peculiarly qualified to shine in this than in any other pursuit.

There is an anecdote of Mr. Wells, relating to the period of his editorship, which, as it accords with his exalted character for morality during his whole life, may not be improperly inserted here. Mr. ———, a friend of his, being invited to the field, at a period when the practice of duelling was deemed most genteel and fashionable, in the city of New York, called upon Wells to act as his second. This he very cheerfully and readily undertook; but with a degree of adroitness almost without a parallel in those times, he succeeded in settling the dispute without a meeting, and this even to the satisfaction of those who entertained the greatest scruples whether the (then) rigid code of honor could be satisfied without blood or the brand of cowardice upon, at least, one of the parties. At a time when the laws of honor, like those of Draco, may be said literally to have been written in blood, it is no mean compliment to the dexterity of Wells, that he should have been enabled to compass such an object, in so satisfactory a manner. To distinguish away a trial by battle, pending between two hot political combatants of that era, by setting up an exception in the law, and convincing the Court of its existence, shows that he was not a proficient in the common law alone. " It may be truly said of him, (as of another eminent lawyer) that he could walk a narrow isthmus, between opposing doctrines where no man dared to follow him !"

The station of an editor, it may well be supposed, was the last which would inspire a confidence in the client, that his professional business, of an every day character, would be faithfully attended to; and his ordinary income as a lawyer, small as it had been, was probably diminished by this circumstance. But in the end it proved what it is said the conduct of the Edinburgh Review was to the famous Scotch advocate, Mr. Jeffrey, " both friendly and hostile to him as a barrister." His after efforts at the bar showed him a splendid illustration of Lord Bacon's maxim, that writing forms the correct man. But this alone is not the most striking point of view in which it influenced his success as an advocate. It finally proved the direct and leading cause of bringing him before the public with that blaze of talent (long hidden by the force of adverse circumstances) which shone with a brightening lustre to the latest period of his life.

The late Mr. Cheetham, (at the time of which I am speaking) edited the leading paper of the majority. As such, he had recognized in Mr. Editor Wells, his most formidable antagonist in the political tournament. Cheetham had been prosecuted in the Supreme Court of this state, by Mr. W. S. Smith, the son-in-law of the late President Adams, for a libel, published in the " American Citizen," a paper then edited by Cheetham. This publication, which reflected very severely upon the conduct and character of Mr. Smith, a leading member of the minority, called forth their greatest animosity, embittered by their recent defeat in the state. En-

Judge Betts affords an opportunity for making a final dis-position of the point, which it is desirable should be done.

couraged by the hope of wounding, and perhaps prostrating their oppo-nents, by the destruction of their favorite editor, they had arrayed against him a veteran host of talent, as one means of compassing their object. Cheetham and his friends perceived, that in justice to themselves, a force should be placed upon the defensive, qualified to meet and sustain the at-tack with the most formidable front, and the greatest possible firmness and effect. And though little hope was entertained of parrying or repelling it entirely, it was believed that proper arrangements would mitigate the blow, and prevent any decisive consequences which might otherwise follow the defeat. Reasoning from the force with which Wells had wielded the pen in the cause of the minority, Cheetham drew inferences directly the opposite to those of his friends; and contrary to their advice retained Mr. Wells as counsel in the defence. He went farther, and accompanied this retainer with a request that he should not consider himself the mere associate with the other very able counsel employed in the defence, but should take a leading part in the conduct of the trial. The cause was tried in the city of New York, (my informant thinks) in 1804. He did not, on this occa-sion, disappoint the high expectations which his very partial client had formed of him. His defence was able and masterly, exhibiting a strong, distinct and accurate view both of the law and the facts of his case, vindi-cating those enlarged and liberal boundaries which, founded in the consti-tution and policy of his country, limit the range of speech and of the press, in a manner which would not have derogated from the character of an Erskine. The result was highly favorable to the defendant. The damages were mitigated to a trifle, compared with what was confidently hoped on one side, and feared on the other; and a crowd of listening citi-zens, whom a deep interest in the event had drawn together, as specta-tors of the trial, were left to the full force of curiosity and wonder, on wit-nessing the astonishing and apparently preternatural metamorphosis which the young advocate had undergone. That a genius like his should have been left to plod on in the drudgery of the profession, for a period of thirteen years, in the city of New-York, nearly unnoticed and unknown, with em-ployment so scanty as almost to have driven him from his profession in de-spair, seemed a reflection upon the audience, who had been listening to him with sensations of delight and admiration. But a few weeks, and even days, showed a disposition to atone for their neglect. A spirit of self-complacency, arising from a consciousness of his superior discernment, mingled with gratitude to Mr. Wells, for his faithful exertions in the de-fence, drew forth in the next American Citizen, one of the best of those pithy and energetic compliments to his young friend and counsellor, which Cheetham always knew how to bestow with the finest effect. These things were decisive of Mr. Wells' fate. The giant was aroused from his slumbers, and stalked abroad at noon-day.

WOODWORTH, J. Admitting there is no constitutional provision on the subject, I should hold it unfit for a Circuit

From a stinted paucity of business and clients, whose visits had heretofore been "few and far between," he was daily retained in causes of greater or less magnitude. Engagements multiplied upon his hands, and he soon bade adieu to his editorial labors, and devoted himself exclusively to the bar. Yet he was the last to be persuaded of his powers, and he would occasionally relapse into those fits of self-distrust, which had been one great cause of so long withholding him from his proper rank in the profession. He was shortly after the trial of *Smith* v. *Cheetham*, retained as counsel to defend a cause in the Common Pleas of New York, a duty which he discharged in his finest manner. For this, he received a fee of five dollars. But unconscious of his strength, and rising reputation, he forgot that even this humble retainer was a debt due to his talents, and construed it into an act of marked kindness and regard on the part of his client. So grateful was he for what he considered a favor personal to himself, that he ever afterwards remembered this gentleman with the greatest friendship and affection; and in his more prosperous days, anxiously courted every opportunity of doing him a favor. Mr. Cheetham was never forgotten by him; and, I am told, that the gratitude of the counsellor extended itself to the children of the client, in various acts of patronage and protection, when their father was no more.

By leading a life strictly temperate and regular, Wells had overcome the frailty of his constitution, and attained a state of cheerfulness and good health; two important and essential requisites to sustain the amazing weight of professional labor which was about to devolve upon him. His rise was rapid; his practice became extensive and lucrative. He was snatched from want, and placed in easy circumstances, and an increasing reputation, both for talents and industry, promised him a proportional enlargement of business and profit. He availed himself, fully, of all these advantages. He pursued the study and the duties of his profession with unceasing assiduity. He furnished his office with a respectable library, which he was continually enlarging in proportion to his means. He appeared at the bar of the Supreme Court for the first time, in *Elting and others* v. *Scott and Seaman*, (2 John. Rep. 137,) in 1807, where he was sustained by his able friend and senior in the profession, Mr. J. O. Hoffman. Since that time his name is associated with almost every volume of our juridical history.

Having taken up his pen in the cause of the minority, which continued so, with very short intermissions, from 1801 to the present time, he, of course, standing identified with them, did not reap any of those advantages to which an active politician of his intellectual rank might otherwise have looked, as the reward of his labor. He was, (I am told) at one time, a Justice of the Marine Court during the temporary ascendancy of his party; but with this trifling exception, I cannot learn that he was ever, in the least,

Judge to act as counsel. It would be plainly so in relation to the Chancellor or Justices of the Supreme Court; and I would make the rule universal.

---

indebted to office, either for the profits or the honors in which he has so co-piously and deservedly shared.

In 1812, he was visited by a severe domestic calamity in the death of Mrs Wells, to whom he had always been very tenderly attached. He remem-bered her meekness, her kind attentions in adversity—she had shared in his prosperity without ostentation. Her death brought back to his mind associ-ations which awakened his early woes—he was a man, and he mourned the bereavement. But he was a Christian, and he bade her adieu with a full persuasion that he should see her again; that she had gone to sleep for awhile, but would shortly awake to happiness forever.

He was married again in 1816, to Miss Huger, of the city of New York, daughter of Charles Huger, deceased, late of Charleston, (S. C.) a highly respectable and accomplished lady, who survived him, and still continues to reside with his children at the family mansion.

His health continued remarkably fine, and almost without intermission, till within three days of his death. On Wednesday evening, the 3d Sep-tember, 1823, having been actively engaged in business during the day, he returned to his family, complaining of extreme weakness and languor, for which he said it was difficult to account, as he had felt its approach but for a few minutes. He continued in this situation during the two following days, with very little pain, but attended by a rapidly increasing debility. It was not till Saturday, the 6th September, that any fears were entertained of his approaching dissolution, either by himself or his family; and he expired a few minutes after these apprehensions arose, apparently falling asleep as if from mere fatigue or exhaustion.

Mr. Wells did not aspire to the character of an universal genius, and he undoubtedly selected his fort, or strong ground, when he commenced the study of the law. The foundations of his reputation in this department were, a mind naturally strong and comprehensive, improved by the usual classical studies, a critical acquaintance with English belles-letters, and a la-borious systematic study of the common law, both in its theory and practice. He despised the character of a mere sciolist in his profession, the tame and idle spirit which wanders among glossaries, digests and indices, content with rules and principles in the abstract, without knowing how they ever have been or can be applied. He did not fear the imputation of being a case-lawyer, because he had traced the law to its ancient sources, by looking into and studying the cases themselves, instead of receiving them upon trust, on the authority of Blackstone, Comyn, or Bacon. He was a prac-tical refutation of that quackery which holds any strength of mind in a lawyer, however great it may be. a safe substitute for study and authority Accordingly, his library was early and extensively stored with books of common law, indiscriminately, as well as those which relate to the three

SUTHERLAND, J. Concurred.

SAVAGE, CH. J. I think the constitutional ground the

Seymour
v.
Ellison.

kindred and closely connected branches of international, maritime and commercial law. As a proficient in the latter, he was generally acknowledged to stand unrivalled at our bar. His law books and cases had a decided preference with him, though they by no means excluded the pursuits of various literature. He was pleased with the calls and attention of his friends, but study and business had ripened into a second nature, and so far from being a burthen, he could return to it, with zest, from the greatest delights of social intercourse. The transition from a state of high enjoyment and glee in the circle of friendship, to one of the most profound engagement and abstraction, did not appear to cost him a single regret, or a single effort.

The cause of his client was always an object of peculiar solicitude. This he never neglected. In addition to the general stock of knowledge which he brought to his aid, it uniformly underwent the most exact and scrupulous examination as to its particular features. No principle, no case bearing upon the subject, which his various knowledge and extensive library afforded, was omitted in the process. The evidence was weighed; the latent defects explored; and his opinions, in cases of doubt and difficulty, were seldom expressed till he had attained the point of certainty as nearly, perhaps as it could be reached by legal demonstration. His conclusions, thus carefully formed, were sustained by him before the various Courts where he practiced, with a firmness and boldness which pertained to a consciousness of their accuracy, and a learning eminently calculated to edify and aid the researches of the most enlightened and experienced tribunal. " He has," said the late Chancellor Kent, on hearing of his death, " been pouring instruction over my mind for fifteen years."

He was persuaded that the lawyer, though he has prepared his case by laying his premises, and proceeding to a conclusion in his own mind, has performed but the minor part of his duty. The operations of the closet have yet to withstand the criticism of some lynx-eyed adversary, and undergo the siftings and canvassings of the bench. Successfully to conduct his official auditors to the same conclusion, to simplify, to elucidate, to demonstrate, to convince, to transfuse his own ideas into the minds of others, to refute the arguments of opposing counsel, animated by convictions perhaps equally strong, and actuated by powers equally commanding, to detect the sophistries, dissipate the obscurities, obviate the doubts, and disentangle the subtilties in which zeal and ingenuity have involved the subject, or to meet all these by anticipation when the order of proceeding will not admit of a reply, was, in the important, intricate, and nicely balanced causes in which Mr. Wells was frequently engaged, and before the Courts where he usually appeared, one of the loftiest efforts of human genius. It was on occasions like these, " when the matter matched his mighty mind," when his highest

true one; and I would refer the decision to this, instead of general unfitness. The section alluded to by Mr. Presi-

powers were truly put in requisition, that he justified the public in the rank which they had assigned him, of the most accomplished lawyer and eloquent pleader in the state.

In the discharge of his duty as an advocate, he generally avoided any thing like an exordium, and endeavored to lead his hearers by the short-est and most distinct rout to the real point in controversy. In doing this he was rarely unsuccessful. The mind was suddenly filled with his sub-ject, stripped of every thing trifling and impertinent, or connected only with such agreeable associations as were calculated to interest his audi-ence and fix their attention. His power of simpli ying the most intricate cases has often been admired, and seldom, if ever, excelled. This enabled him to keep in constant view the strong points of his cause. He was a perfect master of the narration; his memory reached all its details; and when interrupted as having maimed or distorted evidence, the explanation which followed generally resulted in the most triumphant accuracy. In the distribution of his subject he was rigidly methodical, and his arrange-ment appeared to be the most natural and lucid of which it was suscepti-ble. Indeed, he had no wish to perplex, entangle, or mislead; for he would not violate his own clear convictions; and having been cautious to be well persuaded in his own mind that the cause was with his client up-on its ultimate merits, his arguments seldom rested on merely technical and formal grounds. If he became satisfied that his adversary could not be an-noyed, unless by a professional *ruse de guerre*, operating in derogation of his plain and substantial rights, success in such legal legerdemain had no charms for him, and he either advised a compromise upon equitable principles, or withdrew from the controversy. He uniformly examined the whole range of discussion, and sought such a result as he believed would be reflected by the mirror of the law in its truth and purity. To this result he adhered with a Spartan firmness, which showed that he considered its maintenance not only a matter of private but of public duty. Hence he gave no countenance to uncertainty and innovation, by endeavoring to sub-stitute the maxims of a fanciful morality for those of law; though where the legal rule which governed his case was doubtful, no one was better qualified by a philosophic view of its moral merits, to show which side of the scale should preponderate; and no one was entitled to assume a higher tone upon those questions which have been treated as belonging to the school of im-perfect obligation. For,

Wells was a christian moralist. He had in early life made the doctrine of etchics, as refined and exalted by the promulgation of the gospel, the subject of a thorough investigation. The consequence was a profound sense of its truth and importance. And though he viewed its great and leading doctrines as extremely simple and easily applicable to the ordinary duties of life, he did not believe that one whose profession or extensive

dent, provides that "neither the Chancellor, nor Justices of the Supreme Court, nor any Circuit Judge shall hold

connections in business was continually bringing under his review the conduct of mankind in its greatest variety, should content himself with the knowledge of its rudiments. He, therefore, regarded it as a part of his professional duty, to be well acquainted with the moral code. And if the effect of its doctrines upon his heart, and his practice in all the relations of life were to form the test of its excellence, the scoffs of scepticism would be silenced forever, and the maniac ravings of the atheist regarded as doubly insane. He was a most severe and critical judge of his own conduct. He looked upon religion as intended to regulate our intercourse with one another here, by adding to the ordinary sanctions of temporal morality the rewards and punishments of another life, " according to the deeds done in the body." His sense of duty was formed upon this foundation, and improved into a habit ; so that he presented one of the finest models of every thing excellent in private life, and brought with him an astonishing weight of character to the bar. He thought it his duty to make a public profession of religion. Satisfied that the creed and practice of the English Episcopal Church were the nearest in accordance with his views, as being the most liberal and enlightened of any which prevailed among the various, though respectable denominations of christians in this country, these circumstances determined his preference. For several years before, and at the time of his death, he was a member of Grace Church, in the city of New York. But he was a professor of *religion*—not a *party professor*. In relation to all other christians, professing or otherwise, he was mild and tolerant. Amidst bitter railings, sectional accusations, harsh epithets, vindictive jealousies, obstinate diversities of sentiment in matters of trifling moment, adding fuel to schism and arguments to infidelity, he stood a firm, unshaken example of forbearance, candor and charity. And while he lived the life and maintained the character of a sincere and pious believer, he was humble and unobtrusive in his opinions, content and happy that his "serious thoughts should rest in heaven."

" As some tall cliff that lifts its awful form,
Swells from the vale, and midway leaves the storm,
Though round its breast the rolling clouds are spread,
Eternal sunshine settles on its head."

I have noticed the morals of Mr. Wells in this place, because they entered much into his character as an advocate. His language to all others, so far as their religious creed came into question, was precisely that of our constitution : " You may be right, and I may be wrong." Hence no one could be less assuming, less dogmatical, less the practical sectarian. But this very circumstance rendered his rebuke of every palpable deviation from the plain standards of moral conduct, the more awfully stern and severe ; and gave double point to those fine strains of moral reasoning sometimes resorted to by him, either with a view to strengthen the legal inference for which he had been contending, or to elicit, explain or rectify

any other *office or public trust.*" I am aware there is a decision of the Supreme Court, upon the same question

a point left in doubt by the obscurity, inaccuracy, or discrepancy of the books, or the total absence of authority. On these occasions he was truly inimitable. While with his own master hand he led you back to the infancy of the common law, traced the various operation of moral causes which gave it birth, and growth, and maturity, and threw a blaze of light over that which had been hidden in the darkness of ages, you almost confounded the advocate with the awful voice of Justice herself, teaching to her own tribunals the first principles upon which her laws should be administered.

He was an orator of the first order. " A man may be called eloquent," says Doct. Goldsmith, " who transfers the passion or sentiment with which he is moved himself, into the breast of another. An intimate persuasion of the truth to be proved, is the sentiment and passion to be transferred; and who effects this, is truly possessed of the talent of eloquence." Perhaps no man was ever a more perfect illustration of this definition than Mr. Wells. Having devoted himself to the forum, the talent which he cultivated with the greatest assiduity, and with the most complete success, was that of ratiocination ; and there is no doubt that this formed the predominant character of his eloquence. Yet he was seldom uninteresting, even in his most ordinary efforts ; and he was far from being fettered to the dry details of business-like discussion, when not strictly required by the matter under consideration. Nature had given him all the vehemence, the fire, the mirth, the wit and the pathos which characterize so many of the bar in the country of his European ancestors ; but it was the study of his life to master his native propensity, and make it give place to a substitute ordinarily more useful and efficient in the labors of the forum. He so far succeeded, as never to overact, but always measure the exercise of these interesting qualifications strictly by the nature of the subject. Yet though the ground which he trod was that of the philosopher, the lawyer, the logician, he delighted to pluck the flowers which sprang spontaneously in his path, while he trampled with disdain the far-fetched and tawdry exotic. He could laugh out of countenance the foibles and follies of mankind ; and meanness, treachery or fraud, touched by his sarcasm, intolerably pointed and severe, started into their naked deformity. Sometimes you might see affectation or hypocrisy writhing under the lash of his irony, and when called to act in the cause of oppressed and suffering humanity, he awoke into the liveliest action all the strings of the soul.

But his arguments were usually conducted with direct and sober earnestness, and so framed as to convince rather than amuse. Sometimes they were terse and condensed ; at others full and illustrative ; and though he was occasionally pointed and sarcastic, he was commonly gentle and conciliating. His candor and integrity often drew the warmest sentiments of approbation and respect from opposing counsel. In his opening, he proceeded with slow, regular and deliberate movements, oc-

arising under the *duelling law*,(*a*) that an attorney or counsellor, as such, does not hold an *office* or *public trust*, with-

ALBANY,
Sept. 1823.

Seymour
v.
Ellison.

(*a*) 20 John
Rep. 492.

cupying as he advanced, such strong, distinct. and well fortified positions, directly on the road to his object, as led you along a safe and a willing follower, and prepared you at once to echo his conclusion. The whole bore so much the appearance of study, system and preparation, as induced you at times to place his great strength in this department, and to doubt his powers of reply. You were deceived. He could not only seize on the most opposite arguments almost *intuitively*, and *wield* and *fashion* them as circumstances or inclination directed ; but he was prompt, skilful, and decisive, in meeting, at every point, the various assaults of adverse ingenuity.

He had a masterly manner of clothing a long chain of connected ideas in the choicest language. His voice was flexible, under good management, and easily accommodated to the sentiment he was desirous to express ; of a fulness and compass which enabled him to discuss a question for a long time, and in the most animated manner, without faultering or hoarseness ; and so clear and loud as to render one sitting near him slightly uneasy from the *weight* and *pungency* with which it fell upon the ear. It was naturally forcible and commanding ; and its softer tones of mild persuasion were evidently the result of cultivation and discipline.

In his person, Mr. Wells was slightly above the middle size. He bestowed greater attention upon its neatness, and his dress was more fashionable and better adjusted, than is generally deemed consistent with his habits of study and abstraction. His form was erect, solid, firm, well proportioned, and apparently fitted to endure great muscular exertion. His features were regular ; and his complexion, which was somewhat lighter than might be expected to accompany his glossy-black hair, his dark eyebrows, overshadowing a pair of keen, full and black eyes, was tinged with a glow of good health. Nature had probably thrown into his countenance something which phisiognomy would call an air of archness, cunning and subtility ; but this had long since been subdued to the bold open front of honor and integrity. In the excitement of debate, his eye sparkled with peculiar lustre, and his whole countenance beamed with intelligence. Engagements of less importance, or the hour of total relaxation from business changed these appearances only in degree, and superadded a composure, mildness and benignity, which would have led the philosopher or the philanthrophist instinctively to have sought him out as a brother.

Of all men, perhaps, he was the least trained " to set his looks at variance with his thoughts." His countenance uniformly proved traitor to the workings of his mind. I am told by a gentleman who was for many years clerk of the circuit and sittings in New York, that he could always discover, through this medium, Mr. Wells' confidence or want of faith in his cause ; that, on some dark feature coming out against his client, he would turn to him with a lour of suspicion, and demand, in a peremptory under tone, " Sir, how can you explain this to me ?" His high cultivation of the

in the meaning of the constitution ; but the same question lately arose before the present Chancellor, who, after the fullest consideration, arrived at a different, and to me a satisfactory conclusion.  I am of opinion, that an attorney

---

moral sense rendered him a most miserable advocate for a client who failed to satisfy him that he deserved his aid ; but this very circumstance imparted to him a zeal, acuteness, and perseverance in the vindication of what he was persuaded to be right, or in the refutation of what he believed to be wrong, which, sustained by his high powers as a lawyer and orator, rendered him as safe an advocate as justice herself could desire.

His gestures were easy and dignified : his delivery natural, firm and well accented, occupying that happy medium between slowness and impetuosity, which gave to every word its full and distinct pronunciation, and dealt to every sentence its proper measure and emphasis ; so that with his perspicuity of arrangement and expression, no speaker could be more easily understood. There was nothing like hesitation, "recalling or re-casting of sentences as he went along ;" but, on the contrary, he was perfect master of his language as well as of his subject ; and the occasional grandeur of his peroration, showed him no less the towering and sublime, when his subject called for it, than he was, on ordinary occasions, the forcible and argumentative speaker.

Such is the life, such the death, such the character of Mr. Wells. Perhaps no man in this country ever reached the same elevation and occupied so large a space in the public eye, upon the mere footing of professional eminence and individual worth. "Men of talents in the United States," it is said, "are generally bred to the bar ;" and it is not to be denied that there are many of these who have stood, and who now stand as high in the public estimation as Mr. Wells ; that the influence of their talents and character has been equally benign, and much more extensive, than we are entitled to claim for him ; and, consequently, that their reputation filled a wider region. Such, perhaps, were many of those who have departed before him ; among whom were a Hamilton, a Parsons, a Dexter, a Pinckney, a Livingston. Yet how far the high offices which these great men held at various periods, and the disposition of the different political parties in which they figured to make the most of their leaders may have entered into the formation of their characters, it is indeed impossible to determine ; but it is not dealing unfairly with their memory when we make great allowance for the force of such circumstances. These adventitious causes had no agency in the fortune and character of Mr. Wells. He stood alone—the architect of his own greatness. The wreath which he wore was not won in a race with plebian competitors, for he was a master spirit in the ranks of the American bar—the talent and the intellectual enterprize of the Republic—noble and generous rivals, who yielded him, with common consent, and with cheerfulness and pride, the honors he had achieved.

or counsellor does hold *an office* or *public trust*, within the sense of the constitution.(*b*)

## (*b*) IN THE CASE OF DANIEL WOOD.

### *Before* SANFORD, *Chancellor.*

In this case, it became a question, what oath or oaths should now be required from solicitors and counsellors, upon their admission to the bar. If the station of a solicitor or counsellor is an office or a public trust, the oath to be taken is prescribed by the new constitution, and no other oath can be required. If this station is not an office or a public trust, the oaths heretofore required must be taken.

THE CHANCELLOR.—So far as the legal profession is an occupation open to all, there is no reason to consider a lawyer as a public officer. The exercise of his profession is, in part, an occupation, in which every person is free to engage ; but it is not so in respect to proceedings in the courts of justice. These proceedings are, according to our laws and usages, conducted by a distinct class of men, especially appointed for this service. The practice of the law, in the courts of justice, is permitted only to those who are appointed by the courts : the persons appointed are subject to the control of the courts ; and they may be deprived of their right to pursue this occupation. These regulations evidently consider the practice of the law in the courts as a part of the administration of justice ; as a function, important not merely to private parties but also to the public. They are regulations, which are supposed to be necessary or conducive to a good administration of public justice. The admission of an attorney, solicitor or counsellor, is a general appointment to conduct causes before the courts : This station, thus conferred by public authority, has its peculiar powers, privileges and duties ; and this station thus becomes an office in the administration of justice.

Attorneys, solicitors, and counsellors, are constantly denominated officers of the courts by which they are appointed. Our laws have required that upon their admission, they should take a particular oath for the faithful discharge of their duties ; and that oath is termed by the legislature itself an oath of office. In this, as in other regulations, the legislature have considered and treated persons appointed to practice the law, as holding a species of office.

The oath of office prescribed by law for attorneys, solicitors and counsellors, is still requisite, if it is not superseded, by the existing constitution ; and either that oath, or the oath of office established by the constitution, must now be taken. If this station was an office before the adoption of the existing constitution, it is an office still ; and if it is an office under the laws of the state, it is an office in the sense of the constitution.

The constitution of the union requires, that all executive and judicial officers of the United States, and of the several states, shall be bound by oath or affirmation to support that constitution. The supreme court of the United States have directed that counsellors and attorneys admitted to practice in

ALBANY,        SANFORD, Chancellor, concurred with the Ch. Justice.
Sept. 1823.

Seymour        SUDAM, Senator, concurred with Mr. Justice WOOD-
v.
Ellison.        WORTH.

THE REST OF THE COURT were of opinion, generally, (without mentioning the particular ground upon which they decided,) that a Circuit Judge should not appear as counsel in this Court; and the hearing of the cause was postponed to the next session, to the end that other counsel might be retained, and prepared to argue for the respondents.

that court, shall take an oath or affirmation to demean themselves uprightly, and also to support the constitution of the United States: Rule of February term, 1790, and rule of February term, 1791. Attorneys and counsellors are thus considered, by that court, as officers of the United States, under the national constitution: and the terms of that constitution, " executive and judicial officers," are also the terms of the constitution of this state. This is not only high authority, but it is also most direct authority, upon the question, now arising here; the oaths to be taken by public officers being the subject of regulation in both constitutions, and the words used in both being the same. It is not to be doubted, that the same terms have the same meaning in both instruments; but if such a doubt could arise, it must vanish, when we perceive that the constitution of the state, in establishing the oath to be taken by officers of the state, includes also the oath to support the national constitution: thus, incorporating the two oaths, and making them applicable to the same persons and cases.

The terms " office and public trust," have no legal or technical meaning, distinct from their ordinary signification. An office is a public charge or employment, and the term seems to comprehend every charge or employment in which the public are interested. The words public trust, still more comprehensive, appear to include every agency in which the public, reposing special confidence in particular persons, appoint them for the performance of some duty or service. The obvious intention of the existing constitution is, to establish one oath for all officers and for every public trust; and I am accordingly of opinion, that the oath so established, must be taken, and consequently, that no other oath can be required.