In the Matter of the Application of THE PEOPLE ex rel. FRANKLIN D. SHERWOOD, Respondent, for a Mandamus, *v.* THE STATE BOARD OF CANVASSERS, Appellant.

A party can demand a mandamus only to secure or protect a clear legal right; never to accomplish a wrong, or the violation of a constitutional provision.

The writ, therefore, should not be granted upon the application of an individual to compel the issuing of a certificate of election to one who has no right under the Constitution to hold the office.

A member of the board of park commissioners, appointed under and in pursuance of the act of 1891 (Chap. 308, Laws of 1891), providing for a public park in the city of Hornellsville, is an officer under the city government within the meaning of the provision of the State Constitution providing "that no person shall be eligible to the legislature who, at the time of his election is, or within one hundred days previous thereto has been, * * * an officer under any city government." (§ 8, art. 3.)

Upon application for a mandamus to compel the board of state canvassers to issue a certificate of election as state senator to the relator, who concededly had received the greatest number of votes for that office, it appeared that he had been duly appointed as a member of said board of park commissioners; that he duly qualified and was acting as such commissioner at the time of his election. *Held* (ANDREWS and FINCH, JJ., dissenting), that the writ was improperly granted; that a denial of the relief sought was not an interference with the jurisdiction of the senate given by the provision of the Constitution making each house of the legislature the judge of the elections and qualifications of its members (§ 10, art. 3) as it no way affected the right of that body, when it convened, to determine as to whether the relator was entitled to the office; that the refusal of the writ was simply an exercise of the jurisdiction

1891.] People ex rel. Sherwood v. Bd. Canvassers.    361

Statement of case.

the relator had invoked by refusing to aid him in a proposed intrusion into the office.

Also *held* (Andrews and Finch, JJ., dissenting), that the proceeding was simply one to enforce a civil remedy in favor of the relator, and could not be treated as in any sense one on behalf of the people, or, by amendment, be turned into such a one.

A writ of mandamus on behalf of the people in their sovereign capacity can be awarded only upon the application of the attorney-general, or some district attorney, and the indorsement upon the writ must show that it was issued upon such application. (Code Civ. Pro. § 1993.)

*It seems*, substantially the same question would have been presented had some other elector been the relator.

*It seems*, the board of state canvassers acts ministerially and has no jurisdiction to go outside of the returns of the county canvassers, or to institute an inquiry as to the eligibility of the candidates voted for by the electors; nor has it authority to determine whether a minority candidate was elected where it appears that the majority candidate was ineligible.

*It seems* also, that none of the officers charged with the duty of canvassing votes derives any power to pass upon the eligibility of candidates, or to disregard votes cast for an ineligible candidate, under the provisions of the Ballot Laws of 1890 (§ 21, Chap. 262, Laws of 1890), providing that "whenever a candidate for any office whose name is printed on the official ballot, shall have died, shall be or become ineligible, or shall have withdrawn before election day, voters may use an unofficial ballot * * * and the name of the * * * candidate shall be considered as having been erased from the official ballot." That provision was intended merely to enable voters in the cases mentioned to vote unofficial ballots, and only in case some candidate has been voted for by an unofficial ballot is the name of the candidate on the official ballot to be considered as having been erased.

*It seems* also, that the board of state canvassers derives no power to inquire as to the eligibility of the relator, from the provision of the Code of Civil Procedure (§ 843), declaring that "where an officer, person, board or committee, to whom or to which application is made to do an act in official capacity, requires information or proof to enable him or it to decide upon the propriety of doing the act, he or it may receive an affidavit for that purpose;" that as said board has no jurisdiction to inquire as to the relator's eligibility, it can have no official act to perform in reference thereto, and so, can require no information or proof to enable it to enter upon such inquiry.

(Argued December 11, 1891; decided December 29, 1891.)

Appeal from order of the General Term of the Supreme Court in the third judicial department, made December 7,

1891, which affirmed an order of Special Term directing a writ of peremptory mandamus to issue, commanding the state board of canvassers to issue to the relator a certificate of election to the office of state senator.

The facts, so far as material, are stated in the opinions.

*Isaac H. Maynard* and *Delos McCurdy* for appellant. The relator was at the time of the election, and is ineligible to the office of senator. (Constitution, article 3, § 8; chap. 308, Laws of 1891, §§ 1, 7, 11, 12; 2 Cowen, 29, 30; *People* v. *Comptroller,* 20 Wend. 598; *Rowland* v. *Mayor,* 83 N. Y. 376; *People ex rel.* v. *Nostrand,* 46 id. 381; *People ex rel. Kelly* v. *Common Council,* 77 id. 503; *People ex rel. Gass* v. *Lee,* 28 Hun, 471; *Ham* v. *Mayor,* 70 N. Y. 459; *Dannat* v. *Mayor,* 6 Hun, 88; 66 N. Y. 585; *Maximillian* v. *Mayor,* 62 id. 160; *People ex rel. Murphy* v. *Kelly,* 76 id. 487; *Walsh* v. *Trustees N. Y. & B. Bridge,* 96 id. 437; *Ehrgott* v. *Mayor, etc.,* Id. 274; *Bailey* v. *Mayor, etc.,* 2 Den. 433; *People* v. *Civil Service, etc.,* 41 Hun, 287.) The electors had knowledge of relator's ineligibility, and every vote given for him was void. (§ 21, Ballot Reform Law; *Gulick* v. *New,* 14 Ind. 102, 103; Grant on Corporations, 107; *Biddle* v. *Willard,* 10 Ind. 62, 68; *Carson* v. *McPhetrige,* 15 id. 331; *Price* v. *Baker,* 41 id. 572; *Stewart* v. *Hayes,* 3 Chicago Legal News, 117; Cush. Law & Prac. Leg. Assemblies, 66, 67; 13 Col. Rep. 145; 14 Ind. 97; *People* v. *Clute,* 50 N. Y. 461; *Gosling* v. *Veley,* 7 Adol. & El. 406; 53 Eng. Com. Law, 406.) The state board of canvassers may be legally informed of the fact that the candidate is ineligible. It is clothed with quasi-judicial powers. (§ 32, chap. 130, Laws of 1842; *State ex rel. Snyder* v. *Newman,* 91 Mo. 445; *People ex rel. Young* v. *Straight,* 128 N. Y. 545; Code Civ. Pro. § 843; 2 R. S. 552, § 11.) Relator must show a legal right to a mandamus, and if any essential fact is controverted by affidavit, it ought not to be granted. (*People* v. *Stupp,* 49 Hun, 544; *People* v. *Reardon,* Id. 425; *People* v. *Cromwell,* 102 N. Y. 477; *People* v. *Board, etc.,* 107 id. 225.) The moving papers do

not show sufficient grounds to authorize a mandamus against the state board. (*People* v. *Fairman*, 12 Abb. [N. C.] 252 ; *People* v. *Board, etc.*, 64 N. Y. 627 ; *People* v. *Supervisors*, 73 id. 173 ; *People* v. *Cromwell*, 102 id. 477.) Mandamus to compel the delivery of a certificate of election to an office will not lie, if it appears that the applicant therefor was not duly elected, or could not lawfully be voted for at the election. (*McKee* v. *Bd. of Suprs.*, 10 Cal. 376 ; *Peters* v. *Bd. of State Canvassers*, 17 Kan. 365 ; *Bose* v. *County Comrs.*, 50 Me. 243 ; *Sherman* v. *Horn*, 45 Mich. 160 ; *State of Miss.* v. *Albig*, 44 Mo. 346 ; *State of Kansas* v. *Robinson*, 1 Kan. 17 ; *State* v. *Whittemore*, 11 Neb. 175.)

*Joseph H. Choate* for respondent.

*Wm. A. Sutherland* for respondent. The affidavit of Mr. Parkhurst, dated December 7, 1891, should be considered. (*Marbury* v. *Madison*, 1 Cranch. 137 ; *Peck* v. *Goodberlet*, 109 N. Y. 189 ; *T. & B. R. R.* v. *Circuit Judge*, 44 Mich. 479 ; *People* v. *Baker*, 35 Barb. 113, 114.) No extraneous papers can be considered by the board of state canvassers and the writ of mandamus was properly issued. (*People ex rel. McDill* v. *State Canvassers*, 36 Wis. 498 ; *People ex rel. Drew* v. *State Canvassers*, 16 Fla. 1 ; *State* v. *Lawrence*, 3 Kan. 95 ; *State* v. *Hague*, 8 S. C. 367 ; 14 Am. & Eng. Ency. 198, 200.) The board of state canvassers must tabulate and declare the result of an election only from the certified statements of the county canvassers. (*People* v. *Cook*, 8 N. Y. 67 ; *Gatling* v. *Boone*, 3 S. E. Rep. 392 ; *Peebles* v. *Commissioners*, 82 N. C. 385 ; *People* v. *State Canvassers*, 36 Wis. 498 ; *People* v. *State Canvassers*, 16 Fla. 1.) It has no power to inquire into Sherwood's eligibility. (Const. art. 3, §§ 8, 10 ; Id. art. 10, § 2 ; *People ex rel. Hatzell* v. *Hall*, 80 N. Y. 117, 122, 123 ; *Astor* v. *Mayor, etc.*, 67 id. 567 ; *People ex rel. Kilmer* v. *McDonald*, 69 id. 362 ; Chap. 193, Laws of 1888.) Mandamus is the proper remedy. (*Ex parte Kellog*, 50 Ala. 474 ; *Q. & B. R. R. Co.* v. *Circuit Judge*, 44 Mich. 479 ; *Van*

*Norman* v. *Circuit Judge,* 45 id. 204; *M. M. Co.* v. *Fremont,* 7 Cal. 131; *Ortman* v. *Dixon,* 9 id. 23; *Comrs.* v. *Boone Co.,* 82 Ky. 632; *Virginia* v. *Rives,* 100 U. S. 313; *LaGrange* v. *State Treas.,* 24 Mich. 468; *E. B. F. Co.* v. *Mayor, etc.,* 101 Mass. 488; *Atty.-Gen.* v. *Boston,* 123 id. 460; *State* v. *Racine,* 22 Wis. 259.)

*Matthew Hale* for respondent. The board of state canvassers must declare the result of the election from the certified statements before them. (§ 31, tit. 5, chap. 130, Laws of 1842; § 20, chap. 247, Laws of 1847; §§ 6, 7, tit. 5, chap. 130, Laws of 1842; *People* v. *Cook,* 8 N. Y. 67; *People* v. *Bd. of Canvassers,* 126 id. 392; McCrary on Elections, §§ 227, 231; *Morgan* v. *Quackenbush,* 22 Barb. 74, 77, 78; *Felt's Case,* 11 Abb. [N. S.] 203.). They have no power to inquire into the question of Sherwood's eligibility. (Const. art. 3, § 10; High on Ex. Rem. § 646; *People* v. *Hall,* 80 N. Y. 117; *State* v. *Tomlinson,* 20 Kan. 692; *People* v. *Mahoney,* 13 Mich. 483; *O'Farrell* v. *Colby,* 2 Minn. 180; McCrary on Elections, 345; *People* v. *Clute,* 50 N. Y. 452; Laws of 1871, 748.)

*J. F. Parkhurst* for respondent. The powers of the state board of canvassers are not enlarged or affected by the Ballot Reform Law. (§ 21, chap. 262, Laws of 1890.) It is not given judicial power. (Code Civ. Pro. § 843.) The order commanding the board of canvassers to issue a certificate to the relator should be affirmed. (*People* v. *Lunnie,* 72 N. Y. 496; *In re Sage* v. *R. R. Co.,* 70 id. 220; *People* v. *Ferris,* 76 id. 326.) In no event can a certificate issue to the defeated candidate. (*Clute Case,* 50 N. Y. 452.)

*Eugene Burlingame* for respondent. Mandamus is the proper remedy. (*Virginia* v. *Rives,* 100 U. S. 313; *Atty.-Gen.* v. *City of Boston,* 123 Mass. 460; *People ex rel. Faile* v. *Ferris,* 76 N. Y. 326; *People ex rel.* v. *Lunnie,* 72 id. 496; *Sage* v. *R. R. Co.,* 70 N. Y. 220.) The certified statements of the county canvassers can alone be considered by the state

board. (§§ 6, 9, 18, 20, 23, tit. 5, chap. 130, Laws of 1842; *People* v. *Cook*, 8 N. Y. 80; *People ex rel. Noyes* v. *Bd. of Canvassers*, 126 id. 392.) The senate alone is the judge of Sherwood's eligibility. (Const. art. 3, § 10; 6 Am. & Eng. Encyc. of Law, 283, note 1; *People ex rel. Hutzell* v. *Hall*, 80 N. Y. 117.) The threat and purpose to make a wrong determination justified the issuance of the writs. (*People ex rel. Noyes* v. *Board*, 126 N. Y. 397; *People* v. *Supervisors*, 12 Barb. 217; *People* v. *Board Contracting*, 27 N. Y. 378; 6 Am. & Eng. Encyc. 370.)

EARL, J. In 1891 the legislature passed the act, chapter 308, entitled "An act to authorize the selection, location and acquiring of certain grounds for a public park in and near the city of Hornellsville, and to provide for the maintenance and embellishment thereof." That act provides for the appointment of a board of park commissioners, to consist of six persons; and in the month of May the relator, Franklin D. Sherwood, was duly appointed one of such commissioners. He duly qualified by taking the official oath and giving the official bond therein required, and has ever since acted as such commissioner. At the last election he became a candidate for senator in the twenty-seventh senatorial district of the state and he claims to have received a majority of the votes cast for senator in that district, and that he was eligible to the office, notwithstanding the provision of section 8 of article 3 of the Constitution, which provides that "no person shall be eligible to the legislature who, at the time of his election is, or within one hundred days previous thereto, has been, a member of congress, a civil or military officer under the United States, or an officer under any city government. And if any person shall, after his election as a member of the legislature, be elected to congress or be appointed to any office, civil or military, under the government of the United States, or under any city government, his acceptance thereof shall vacate his seat." The appellants claim that he was ineligible under this constitutional provision, and whether he was or not is the important question now to be

determined. The question has attracted much public attention: it is fairly involved in this case, and the interests of the public require that we should meet and determine it if it is within our judicial competency to do so. It is a pure legal question, depending upon undisputed facts, and it would be quite unfortunate to have this case go through all the courts and to leave the most important and vital matter in it undecided.

There can be no doubt, it seems to me, that the relator holds a public office. He was required to discharge duties, not for his own benefit, not for the benefit of private individuals, but for the public. He was required to take the constitutional oath of office and to give a bond for the faithful discharge of his duties, and he and his associates were clothed with the power of eminent domain. That under such circumstances he was a public officer has never been questioned any where, so far as I can find. (*The case of Daniel Wood*, 2 Cow. 29 ; *People* v. *Comptroller*, 20 Wend. 598 ; *People ex rel.* v. *Nostrand*, 46 N. Y. 381 ; *People ex rel.* v. *Common Council*, 77 id. 503 ; *Rowland* v. *Mayor, etc.*, 83 id. 376.)

Being a public officer, it is next to be determined whether he was an officer under the city government, within the meaning of the Constitution. The act provides in section 1, that there shall be " in and for the city of Hornellsville," a board of park commissioners, to consist of six competent persons. The board is thus constituted *for* the city ; and the act further provides that the members thereof shall be appointed by the mayor of the city, by and with the consent of three-fourths of the members of the common council ; and the mayor may suspend and may also remove any member of the board by and with the approval of the common council. It is further provided that no person who holds " any other city office," shall hold the office of park commissioner, and that upon the appointment of a park commissioner to " any other city office," his office of park commissioner shall be vacated. Every park commissioner is required to give a bond to the city for the faithful discharge of his duties, which is to be approved by the mayor, and the official oath and bond are to be filed with

the city clerk. By section 2, the park commissioners are required to appoint a treasurer, who is to give a bond to the city to be approved by the common council. They are author. ized to select and locate lands for a city park, and to take them by purchase, gift or condemnation; and all such lands are to be taken in the name of the city, and to be paid for out of the city funds, and to be part of the city territory. They are clothed with the exclusive power to govern, manage, direct, lay out and regulate the park; to appoint engineers, clerks, police, and other necessary officers, and prescribe their duties and fix their compensations, and generally, in regard to the park, they are clothed with all the power and authority possessed by the common council of the city. They are also clothed with power to pass such ordinances as they may deem necessary for the government of the park, not inconsistent with the ordinances of the city, which ordinances are required to be published in the official paper of the city; and all persons offending against such ordinances may be punished before any magistrate of the city by fine or imprisonment. It is provided further that a special election shall be held in the city for the purpose of determining whether it shall issue the bonds and acquire the park, as provided in the act.

It seems to me too clear for dispute, in view of these provisions, that the park commissioners are officers under the city government. They hold their offices by appointment of the city government and, therefore, under the city government. All their duties relate to its interests and welfare, and they are actually set in motion by a vote of the taxpayers of the city. They are certainly not state officers, and if they are not city officers, what are they? I believe it was never doubted that the park commissioners of the city of New York and of the city of Brooklyn, are city officers of those cities; and so, we held as to the park commissioners of the former city in *Ehrgott* v. *Mayor, etc.* (96 N. Y. 274). Would anyone seriously contend that a New York or Brooklyn park commissioner would be eligible, under the Constitution, to the legislature? There could be no reason for holding one of them eligible,

which would not be equally applicable to the commissioner or deputy commissioner of public works, or the chamberlain of the city of New York.

It is no answer to these views that the powers and duties of these commissioners are regulated by law, and thus that they do not act under the direction or control of the city government or any of its officers, and that, therefore, they are, in a certain sense, independent officers. This is generally true of all public officers, from the mayor of a city to the supervisor of a town and through all the grades to a town constable. Their powers and duties are regulated by law. The route in which they shall travel is prescribed by law, and unless they are specially subjected to the control of a superior officer, they act independently, subject to no control except the rules of law and the commands and judgments of the courts. And nevertheless the mayor of a city is a city officer and the supervisor and constable of a town are town officers. Because the duties of municipal officers are regulated by statute, the municipality of which they are officers is not responsible for their misfeasance or nonfeasance, except in cases where they act as the agents of the municipality in the discharge of duties imposed by law upon it. And so we held in *Maxmilian* v. *Mayor*, etc. (62 N. Y. 160), and *Ham* v. *Mayor*, etc. (70 N. Y. 459). Although the officers mentioned in those cases were undoubtedly officers under the city government, the city was held not to be responsible for the misfeasance of their subordinates, because the doctrine of *respondeat superior* did not apply to those cases. In them the court followed the case of *Lorillard* v. *Town of Monroe* (11 N. Y. 392), where it was held that the assessors and collector are not in a legal sense the agents of a town in its corporate capacity in the assessment and collection of taxes, and the town is not responsible for any mistake or misfeasance by them in the performance of their duties, and yet assessors and collectors are town officers and are so described in the Revised Statutes.

It certainly cannot be doubted that the legislature was competent to make these park commissioners city officers, and

whether or not it intended so to do must be determined by the language and provisions of the act.

Here the legislative intention is manifested by the circumstance which must usually be controlling, that the commissioners are required to be appointed by the mayor and common council, and by the provision in the act that no person holding "any other city office" shall be eligible to the office of park commissioner, and that if a park commissioner be "elected or appointed to any other city office," his position as park commissioner shall thereby become vacant. It is of course possible that park commissioners could be so constituted by the legislature as not to become city officers, but such is plainly not the effect of this act.

So we reach the conclusion that the relator was not eligible under the Constitution to the senate. The term eligible relates to the capacity of holding, as well as to the capacity of being elected to the office. (*Carson* v. *McPhetridge*, 15 Ind. 327.) Therefore, he could not be elected to or hold the office of senator. He violated the constitutional provision in seeking the votes of the electors, and they violated it in voting for him. As matter of constitutional law, any certificate the appellants could issue to him would be an absolute nullity, and the only use he could make of it would be to violate the Constitution and do a wrong by intrusion into an office which he has no right for one moment to hold.

So we come to the important question underlying this case, ought the court to grant a mandamus to compel the issuing of a certificate of election to one who has no right under the Constitution to the office? Can the relator come into a court of law and ask its aid in his violation of the Constitution and his proposed intrusion into the office of senator? Suppose he came into court a confessed alien or non-resident of the state, would the court, looking merely at the duty of the state canvassers under the law, stretch out its strong arm to help him? Well-established principles of law and a strong current of authority require these questions to be answered in the negative.

A party can demand a mandamus only to secure or protect a clear legal right, never to accomplish a wrong. In High's Extraordinary Legal Remedies (§ 40) it is said: "The writ of mandamus is never granted for the purpose of compelling the performance of an unlawful act, or of aiding in carrying out an unlawful proceeding;" and in section 14, "it is a fundamental principle of the law of mandamus that the writ will never be granted in cases where, if issued, it would prove unavailing;" and in section 26, "it is important that a person seeking the aid of a mandamus for the enforcement of his rights, should come into court with clean hands." I do not attribute to the relator any actual wrong motive or intent in anything he has heretofore done. I simply mean to characterize his acts as they are measured by the Constitution and the laws.

In *Peters* v. *Board of State Canvassers* (17 Kansas, 365), it was held that a mandamus would not be issued against the board of state canvassers to compel it to canvass the votes, and to issue to the relator a certificate of election where he had been elected a judge at a time when no election could properly be held. (See also *Rose* v. *County Commissioners*, 50 Me. 243; *Sherburne* v. *Horn*, 45 Mich. 160, and *State ex rel.* v. *Whittemore*, 11 Neb. 175.)

In *State ex rel. Ensworth* v. *Albin* (44 Mo. 346), an election for judge was held which was not preceded by a registration of voters as required by law, and it was held that the election was invalid, and that the court would not by mandamus compel the County Court to issue a commission to a judge who claimed to be elected, although the functions of the County Court were purely ministerial. The court said: "This court will not issue a peremptory writ of mandamus unless the relator shows that he has a good title or a perfect right to the remedy he demands. He can derive no right from an illegal or invalid election."

In *State* v. *Mitchell* (23 Kansas, 324), it appeared that at an election held in the county of Harper for county officers and for the location of the county seat, the returns made to the canvassing board showed a vote of 2,947, while there were in

fact only about 800 legal voters in the county. An application was made for a mandamus to compel the board to canvass these returns and declare the result, and it was held that, notwithstanding the fact that the duties of the board were mainly ministerial, and that it was not charged with the duty of inquiring into the reception of illegal or the rejection of legal votes, or fraudulent practices at the election, the court would, in the exercise of a sound discretion, not even apparently sanction so gross an outrage on the purity of the ballot-box by issuing a mandamus to compel, in the name of a technical compliance with duty, the canvass of the returns under such circumstances.

In *State ex rel. Snyder* v. *Newman* (91 Mo. 445), the relator was a candidate for mayor of Pierce City at the April election of 1886, and the respondents were the aldermen of that city. An ordinance of the city made it the duty of the aldermen, on a designated day after each election to canvass the returns, to determine who had been elected to the various offices, and to direct the clerk to issue certificates of election to the persons declared elected. In that case the aldermen determined that the relator had received the highest number of votes, but declined to direct the clerk to issue a certificate of election to him, and he sought by the writ of mandamus to compel them to do so. The law declared that no person should be mayor of a city of the fourth class unless he was an inhabitant of the city for one year next before the election. On the pleadings it was admitted that the relator did not possess that qualification, and the court said : "A peremptory writ of mandamus will not be issued unless the relator shows a clear right to the remedy which he asks. The election of a person to an office, who does not possess the requisite qualifications, gives him no right to hold the office. As, by reason of his disqualifications, the relator was not entitled to hold the office, surely he has no right, at the hand of the court, to be armed with a certificate of election — evidence of title to that to which he has no right." And the writ of mandamus was denied.

Inspectors of election are mere ministerial officers, and if an

applicant to be registered makes the proper statement, and the required oath or affirmation, his name must be added to the list of voters, and the inspectors have no discretion or right to refuse to add it. The law makes it their duty to do so, and yet, if a person who has been refused should apply to the court for a mandamus against the inspectors, and it should there appear that he had no right to be registered, and was not in fact a qualified voter, would the court compel the inspectors to register him, and thus place him in a position where he might cast an illegal vote? Would it listen to his claim that he ought to be registered and thus clothed with the apparent right to vote so that he could present his vote on the day of election, and thus test his right to vote? So, when a voter at an election offers his vote to the inspectors, and if challenged, takes the preliminary oath, and after answering fully the questions touching his right to vote, offers to take the general oath, it is the absolute duty of the inspectors to receive his vote. (*People* v. *Pease,* 27 N. Y. 45; *Goetcheus* v. *Matthewson,* 61 id. 420; *People ex rel. Stapleton* v. *Bell,* 119 id. 175.) If in such a case, the inspectors refuse to take his vote, and he is a legal voter, he can compel them to take it by mandamus. But suppose, upon his application for a mandamus, it should appear, upon facts not disputed, that he was not a qualified voter, would the court still compel the inspectors to take his vote, and thus permit the voter to commit a crime, for the sole reason that the law made it their duty to take the vote?

But it is claimed that we have no jurisdiction to determine that the relator was ineligible to the office of senator, because the Constitution, in section 10 of article 3, provides that each house of the legislature "shall be the judge of the elections, returns, and qualifications of its own members." The courts cannot interfere with this jurisdiction of the senate. Whatever may be determined here or elsewhere as to the election or qualification of the relator, or the result of the election in the 27th senatorial district, when the senate convenes, and not until then, it will have absolute jurisdiction of the whole subject, and may determine which of the two persons claiming

seats therein was duly elected and qualified to sit therein; and it may determine that one was ineligible, and that the other was not elected, and that thus there is a vacancy in that district calling for a new election. It is undoubtedly true that the courts cannot by *quo warranto* try the title to a legislative office. But this is not such a case. Here the relator comes into court and asks its aid to clothe him with apparent title to an office, and by its affirmative action, to remove obstacles which stand in his pathway in his proposed intrusion into the office; and upon the undisputed facts, the court is able to see that he is ineligible, and it simply determines that it will not aid him; and in making such determination, it in no way infringes upon the jurisdiction confided to the senate. It simply exercises a jurisdiction which he has invoked.

We would have substantially the same question before us if some elector in the 27th senatorial district had been the relator in this case instead of Sherwood. The same line of reasoning which I have used would answer his application for a mandamus.

This cannot be treated as in any sense a proceeding on behalf of the people. Nor can it by amendment be turned into such a proceeding. A writ of mandamus on behalf of the people in their sovereign capacity can be awarded only upon the application of the attorney-general, or some district attorney, and the indorsement upon the writ must show that it was issued upon such application. (Code, § 1993.) And in such a case the name of no person need appear as relator in the proceeding. Here the writ was awarded upon the application of Sherwood, a private person, and he appears as relator. (Code, § 1994.) In such a case the proceeding is purely one to enforce a civil remedy and the people are present merely as a formal party and their presence is due to the survival of a form which has long since ceased to have any significance or utility. The real party in interest is the relator in such a case, and if he should die the proceeding would abate. (High's Extraordinary Legal Remedies, §§ 430 *et seq.*) We need not, therefore, now determine what this

court would do if the mandamus in this proceeding had been awarded upon the application of the people through some officer authorized to represent them.

We agree that the board of state canvassers act ministerially, and that they have no power or jurisdiction to go outside of the returns of the county canvassers or to institute an inquiry as to the eligibility of the candidates who were voted for by the electors. The question of eligibility is to be answered by reference to the law as well as the facts, and very wisely, as I think, they are not clothed with authority to determine that question. Much less have they authority to determine whether the minority candidate was elected. In the solution of that question is involved not only the eligibility of the majority candidate, but the further question whether the voters voted for him knowing of his ineligibility within the rules laid down in *People ex rel.* v. *Clute* (50 N. Y. 451).

None of the officers clothed with the duty to canvass votes derive any power in a case like this to pass upon the eligibility of candidates and to disregard votes cast for an ineligible candidate from the following provision of section 21 of the Ballot Law of 1890: "Whenever a candidate for any office, whose name is printed on the official ballot, shall have died, shall be or become ineligible, or shall have withdrawn before election day, voters may use unofficial ballots in voting to fill the office for which such deceased, ineligible or withdrawn candidate was nominated, and the name of the deceased, ineligible or withdrawn candidate shall be considered as having been erased from the official ballot; but such unofficial ballot shall contain only the name of the person voted for, in lieu of the deceased, ineligible or withdrawn candidate, and under the designation of the office for which such person is a candidate." That provision was intended merely to enable voters, in the cases mentioned, to vote unofficial ballots, and it is only in case some candidate is voted for by an unofficial ballot that the name of the candidate on the official ballot is to be considered as having been erased. Here there

were no unofficial ballots, and no candidates were voted for except those whose names were upon the official ballots.

Nor does the board of state canvassers obtain power to make inquiry as to the elegibility of the relator by virtue of the following provision in section 843 of the Code: " Where an officer, person, board or committee to whom or to which application is made to do an act in an official capacity, requires information or proof to enable him or it to decide upon the propriety of doing the act, he or it may receive an affidavit for that purpose." As the state canvassers have no jurisdiction to inquire as to the eligibility of the relator, they can have no official act to perform in reference thereto, and they can require no information or proof to enable them to enter upon that inquiry. If they are confined, as we hold they are, to canvassing the returns and in the discharge of that duty to what lawfully appears in or upon the returns, then they can have no need of proof which will enable them to go back of or outside of the returns. I can imagine cases in which this provision would have application to the state board of canvassers, one of which is, where it is claimed that the returns are spurious, or forged, or have been altered, and in that case they might take proof by affidavit to inform themselves as to the facts.

While, therefore, the state canvassers were bound to canvass the returns from the 27th senatorial district and to declare the result in compliance with the law, yet for reasons which we have given, the court will not aid the relator. The action or non-action of the canvassers may be an obstacle in his way, but the court will not by mandamus in a case like this, where the facts showing his ineligibility are undisputed, assist him in removing the obstacle. He and his competitor may both present their cases to the senate without either of them having a certificate of election, and that body will have jurisdiction to determine all the questions of fact and law involved in the matter. If it shall agree with this court that the relator was ineligible and also find that his competitor was not elected, the result will be that a new election will have to be ordered in that district, and the electors there can then choose a person

qualified to hold the office, and then they can be properly represented in the senate. It is far better that they should be called upon to vote again than that the Constitution should be violated. The safety of our government and the success of our republican institutions depend upon obedience to the Constitution and observance of the laws. Liberty, regulated by law, is the foundation upon which the people of this country must build, and it would be quite unfortunate for this court by any decision it may make, to encourage lawlessness anywhere.

It is quite true that a majority of the electors in the 27th senatorial district have, through the ballot-box, expressed their will that the relator should represent them in the senate, and it is unfortunate that that will should for the present be defeated. But under our system of government, founded upon the majority rule, majorities must express their preferences in the form prescribed by the Constitution and the laws. It is better that an election of a senator should fail than that the Constitution or laws should be nullified or violated. In *Gulick* v. *New* (14 Ind. 93), it was well said : "We are reminded that in our form of government, the majority should rule, and that if the course indicated is not followed, a majority of the voters may be disfranchised, their voice disregarded and their rights trampled under foot, and the voice of a minority listened to. True, by the Constitution and laws of this state, the voice of a majority controls our elections. But that voice must be constitutionally and legally expressed. Even a majority should not nullify a provision of the Constitution, or be permitted, at will, to disregard the law. In this is the strength and beauty of our institutions." In the same case it was held that where one of the candidates was ineligible, and that was known to the electors, or the facts were such that they were bound to know it, votes cast for him would be ineffectual, and would have to be disregarded, and the candidate receiving a majority of the legal votes declared elected.

Our conclusion, therefore, is that the orders of the General and Special Terms should be reversed, and the application for a mandamus denied.

Finch, J. (dissenting).  I agree entirely that the board of state canvassers have only ministerial and not judicial powers; that their sole duty is to make certain computations from the figures of the county canvassers, returned to them for that purpose according to law, and having made them to declare the result by the proper certificates; that in the performance of this duty they are not at liberty to consider or act upon any extraneous papers or information beyond that contained in the canvasses themselves, considered and treated wholly as such; and that no question beyond the result of the figures can lawfully receive their attention or solution.  To this extent, as I understand it, we are all agreed, and there exists among us no difference of opinion.  And so we may regard the proposition stated as fully and definitely settled, in accordance with the unvarying current of authority, and the usage which has been uniform and without a break.  It secures for us, at least, so much of solid ground upon which we can all stand in harmony and concord and without any distressing diversities of opinion.

As we apply that doctrine in the case of Sherwood, the inevitable result is that the state board are required to count the votes in his district, to ascertain who has received the plurality of such votes, and to give to that individual a due certificate of the fact ascertained.  That is all which Sherwood has at any time asked.  Our decision entitles him to his relief even though his mandamus be quashed; for it is not to be assumed that the state canvassers will violate the settled law of the state as expounded to them by its court of last resort. Indeed they themselves, in and by the terms of the stipulation upon which all these cases have been heard, have promised and agreed to act in accordance with the conclusions of the court.  We have interpreted the law for them; we have declared that whether Sherwood was or was not eligible is a subject with which they have no concern, a question which they cannot consider, and which, however decided, can have no influence or effect upon the one distinct and definite duty which they have to perform.  They are men of character and reputation, and it is not to be imagined that the strong and

specific force of a mandamus is necessary to make them do their duty, as that duty has been defined by this court, and as they themselves have formally promised to perform it.

The question, therefore, whether the present writ should be sustained or quashed is, in and of itself, not very important. If the immediate result to the relator was alone to be considered the discussion might end here. · I think it should have ended here: but the technical question of the continuance and operation of the writ has been used to put upon us the abstract question of Sherwood's eligibility, and serve as a justification for a judicial expression of opinion on that subject. What just or useful purpose may be thus subserved I have been unable to discover. Whatever we may think or say about it cannot alter or affect the purely ministerial duty which the state canvassers must perform. Nor can our opinion have any legitimate effect upon the ultimate determination of the question by the senate. As to them it may possibly be regarded as an interference with their duty and an attempt to hamper their independent action. That body may very easily construe our judgment as an invasion of their jurisdiction, an unwarrantable trespass upon a co-ordinate branch of the government, and it would not be strange if they should repel it with indignation, and while not rudely bidding us to keep to our jurisdiction, should find some polite paraphrase to convey that idea. I am afraid we should deserve the rebuke for three reasons, which I shall seek to develop and explain: and these are that the question of Sherwood's eligibility is immaterial to the relief asked; that it furnishes no answer to or defense against the writ; and that we have no jurisdiction to determine the question in any event.

The ground upon which the majority proceed is said to be that the relator, on an application for a mandamus, must show a clear legal right to the relief which he seeks; that this relator to establish such right must show that he was duly elected to the office of senator; that he did not and could not do that because he was ineligible; and so the writ ought not to have been issued. Now, is it a sound method of judi-

cial reasoning to say that a man must show that he was duly elected to an office before he can require the state canvassers to count the votes so as to know whether he *was* elected or not? He comes to this court and demands its aid to ascertain from the proper authority if he *was* elected, and the court says he has no right to have the votes counted unless he can prove the precise fact which he seeks to ascertain. One can imagine such a candidate telling his experience after all was over, and complaining with a somewhat dazed expression that he went to the court to compel a count of the votes and the judges told him that he could not have it because he was ineligible; and then he went to the senate for his seat, and the members of that body told him he *was* eligible but could not have his seat because the votes had not been counted. Such a possible result shows us where the probable fallacy of the reasoning relied on may be found. It lies in the substitution for the relief actually asked and sought of another and different relief not asked and not sought; in treating what is a step in or stage of a process as the exact equivalent of the ultimate result of that process; and in a declared inability to see the difference under its clothing of ambiguous phrases. Sherwood's right to his office is one thing; his right to know how many votes were cast in his favor and who received the most is quite another. He has not asked this court to adjudge him his office, or to decide that he was duly elected to it; he is, therefore, not called upon to show that he *is* entitled to it, or *was* duly elected to it. The relief he *does* ask is that the votes for senator cast in his district shall be counted and the result properly certified. He shows a clear legal right to that relief for the law awards it, and, as we have held this day, it is immaterial to that relief at the hands of the canvassers whether he is eligible or not. To obtain that it is enough for him to show that there has been an election, that votes were cast for him as a candidate, that a statement of them has been sent to the state canvassers, and they refuse to count them for a reason which is no reason and does not excuse. That makes his case, that shows his clear legal right to the relief which he asks, and

which is only one step or stage in a process leading to a wider ultimate result, and one which depends not only upon that step but upon very many others.

I think it possible to uncover what I deem the fallacy of the prevailing opinion in another way. Let us suppose that there has been a very close election, so close that it turns on a question how two or three ballots are to be treated, and the state canvassers refuse to count. One of the candidates applies, as Sherwood did, for a mandamus to compel their performance of that duty. This court says to him — no: we will not order a count until you satisfy us that you have been duly elected to the office which we see you are trying to obtain. Could anything be more unreasonable or absurd? Does not the illustration demonstrate that the candidate who seeks to compel a count need not show that he was elected at all in order to entitle him to the precise measure of relief which Sherwood has asked in this case? It is of no consequence whether the latter has or has not been duly elected, so far as the present application is concerned; and the issue thrust upon the court is wholly immaterial, and only made to seem material by substituting for one step in a process its complete and ultimate result. If it be objected to my illustration that I put a case in which it was possible that the relator might have been duly elected, while here there was no such possibility, I answer that the objection begs the question. It *is* possible that Sherwood *was* duly elected. Neither this court nor any other can forestall the judgment of the senate. We do ourselves honor overmuch when we assume to act as prophets for the constitutional tribunal, and to handicap the rights of the relator before that body.

It was precisely such a state of affairs as that which I have described which this court had in view in *People ex rel. Freer v. Canal Appraisers* (73 N. Y. 446), where it was said: "When the act, the doing of which is sought to be compelled by mandamus, is the final thing and if done gives to the relator *all* that he seeks proximately or ultimately, then the question whether he is entitled to have that done may be inquired into

by the officer or person to whom the mandamus is sought, and is also to be considered by the tribunal which is moved to grant the mandamus; but where the act to be done is but a step towards the final result, and is but the means of setting in motion a tribunal which is to decide upon the right to the final relief claimed, then the inferior officer or tribunal may not inquire whether there exists the right to that final relief, and can only ask whether the relator shows a right to have the act done which is sought from him or it." In the present case, Sherwood's final and ultimate relief is the judgment of the competent constitutional tribunal that he is duly elected senator and entitled to hold the office, and that final relief involves not only his plurality of votes, but his qualifications as well; and he is here, not asking that final relief, but seeking to take one step necessary as a preliminary to it, which involves only the count, but not the qualifications, and neither the canvassers nor the court, in considering his right to that step, can inquire into his right to a different and further ultimate relief.

It follows within the rule established that the relator was not bound to prove what he was not required to assert to entitle himself to the relief which he demanded, and that the issue of his qualification was immaterial.

But that issue is not merely immaterial. Beyond that, it is utterly inadequate and ineffectual as a defense to the mandamus. I decline to express any opinion upon the question whether Sherwood was or was not eligible, for a reason which will later appear, and yet, for the purpose of the argument, I may concede him to be ineligible, and still it may be demonstrated that there is no defense to the writ, and that its command should be affirmed. The whole theory on which this issue is presented is that it destroys the relator's right to relief. Suppose that it does. But has it also destroyed the right of the people? They are the real plaintiffs; the relator is only their informant. He is not the plaintiff, except in his character as citizen, as one of the people, the source of all power and authority. They are the plaintiffs; it is the sovereign who comes to our bar, to this court which it created and can destroy,

with hat in hand, but with a gravity we had better not over-look, and demands of us that we command five public servants, who hold a public office upon a public trust, to perform a clear public duty in respect to a matter of vital importance to the safety and purity of our institutions, which they threaten not to perform in a lawful way; and we answer that the informant who set the people in motion claimed to have a private inter-est of his own, and since we are satisfied that he had none, we deem it our duty to tear up the people's writ and turn the people out of court, and leave unfaithful servants to violate the public law with impunity. In substance, we say to the people, we think you are right and the canvassers are wrong, but we cannot approve of your relator, and in order to defeat him, we quash your writ and turn you out of court. We have not so been in the habit of treating the people coming before us for justice. Even in actions of *quo warranto*, where the people, on the relation of a claimant to an office, brought their suit to remove a usurper holding it without right, and where it was decided that the relator had no title and could have no relief, it was yet ruled that the court should not quash the writ, but proceed to judgment of ouster against the intruder. (*People ex rel. Judson* v. *Thacher*, 55 N. Y. 530.) The principle is well described by Judge FOLGER in *People ex rel. Hatzel* v. *Hall* (80 N. Y. 117), where he says, and I quote both his language and his authorities: "Besides, in the *Duchess of Kingston's* case, all the judges were of opinion that the decision of a question raised between her and Mr. Harvey could not be conclusive between her and the Crown. (20 How. St. Tr. 355; *Barrs* v. *Jackson*, 1 Phillips, 582, 586.) The people are not barred by it. They may still inquire by what right the defendant claims the office. The principle stated in *People ex rel.* v. *Thatcher* (*supra*) applies here: that the sov-ereign may proceed and inquire where like movement on the part of a private person will not be entertained because of his own acts. See *King* v. *Clarke* (1 East. 38), and the cases there cited and quoted from in the argument of counsel for the defendant. And there may be judgment in favor of the

people against the defendant of ouster of him without giving judgment in favor of the relator that he is entitled. (*People ex rel. v. Phillips*, 1 Denio, 388; see also *Comm. v. Sparks*, 6 Whart. 416.)" In the foregoing quotation, the doctrine is clearly established that the defeat of the relator does not defeat the people, and the court must still go on and ascertain the right of the latter. The authority is decisive, and there are none to the contrary so far as I have been able to ascertain. It should be obeyed. If it is, the order appealed from will be affirmed, for, however Sherwood's right as a candidate may be disregarded, his right as a citizen and elector and the right of the people must be sustained. As to them, the only question is whether the state canvassers have threatened to travel outside of the returns; and a few words are to be said on that subject.

The complication began with the action of the board of county canvassers of the county of Steuben. To that body was presented by Charles E. Walker, who was the candidate opposed to Sherwood, and defeated at the polls by a majority of about fifteen hundred, a protest against the issue of any certificate to the latter, accompanied by affidavits showing that, at the date of the election, Sherwood was in fact a park commissioner of the Hornellsville park in said county. The county canvassers, on the tenth of November, after making a correct and truthful statement of the votes actually cast, passed a series of resolutions to the effect that they believed Sherwood to be ineligible to the office of senator; that they themselves had no lawful authority to act upon the fact; but that they accompanied their returns with a statement of the proofs presented and of their belief, and that they transmitted copies of the protest and proofs to the state board " for their consideration and for such action thereon as they may deem lawful and proper." The moving papers show that Charles F. Tabor, attorney-general, and one of the state board, had given an opinion, in his official capacity, before the election that Sherwood was ineligible, and had also declared, so publicly that the

newspapers repeated it, that the action of the county canvassers was a virtual refusal to count any votes for Sherwood; that Walker, after a consultation with "prominent state officers" at Albany, openly declared that he expected to receive the certificate of election from the state board of canvassers; and that persons intimate with the members of such board, and likely to know their purposes, had so declared. Mr. Tabor makes no denial. Mr. Rice, who is secretary of state, makes none, but says in significant general terms that the board in its collective capacity intends to do what is right. Disturbed by the menace involved in the action of the county board, and the threatened procedure of the state board, Sherwood appealed to the court. Under the order of the Special Term, the county canvassers rescinded their resolution of November tenth; adding, "and the said resolution, together with the protest, certificates, affidavits and proof therein referred to (other than the certified statement required by statute) be and they are hereby withdrawn from the consideration of the state board of canvassers." These papers had been received and filed in the office of the secretary of state, who had no lawful authority to receive or file them. After the county canvassers had directed their withdrawal, the deputy county clerk, by authority of the county clerk as secretary of the board, and of the resolution of withdrawal, demanded of the deputy secretary of state a return of the protest and papers. That official refused, saying that demand must be made of the board of state canvassers. When it is remembered that the papers were not in possession of the state board, and never had been, because the count of Sherwood's district has not been entered upon, that they remained solely in possession of the secretary, filed and held, and for no possible lawful purpose, the answer becomes a distinct admission of persistence in the unlawful purpose of their use. Added to all the rest, we find the ineligibility of Sherwood formally set up as an answer to the writ, and the deputy attorney-general appearing before us and distinctly claiming, in behalf of the board which he represents, that they could and should consider and determine that question.

The fact, therefore, is quite beyond contradiction that the secretary of state, as such, and the state board of canvassers have either actually transcended, or threaten to transcend, their power and authority; and that fact is established, although it was not necessary to establish it, since it was held in *Virginia* v. *Rives* (100 U. S. 313) that where the duty is a public one, there is no need of a demand and refusal. The law stands in lieu of a demand, and the bare omission to perform the duty in place of a refusal. Since, then, the duty of the state board is a public duty, and one in which the people are interested, the people's writ commanding them to do that duty cannot be answered or quashed by showing that the private personal right of the relator may not succeed.

But even as against him there is no defense to the writ. Grant that his right as a candidate for the office of senator is answered, and yet there remains his right as a citizen and elector which is fully set out in and shown by the moving papers, a right which we have just recognized in the *Dutchess Co.* case, and the right of the people to compel by mandamus the performance of a public duty. In *People ex rel.* v. *Collins* (19 Wend. 56), it was decided that in a matter of public right any citizen of the state may be a relator in an application for a mandamus, and the doctrine was repeated in *People ex rel.* v. *Sup. of Sull. Co.* (56 N. Y. 253); and even more explicit, and I think quite decisive, is the case of *People ex rel.* v. *Halsey* (37 N. Y. 344). In that case the relator failed utterly to show any private or personal right to the relief demanded, and the writ was not sued out by the attorney-general, and yet the order of the writ was affirmed because it required the performance of a public duty. The court said in answer to the objection taken: "Inasmuch as the people themselves are the plaintiffs in a proceeding by mandamus, it is not of vital importance who the relator should be, so long as he does not officiously intermeddle in a matter with which he has no concern. The office which a relator performs is merely the instituting a proceeding in the name of the people and for the general benefit. The rule, therefore, as it is sometimes stated, that a relator in a writ of

mandamus must show an individual right to the thing asked, must be taken to apply to cases where an individual interest is *alone involved*, and *not* to cases in which the interest is common to the whole community." The court referred to cases holding a different doctrine in some other states and then added: "But the practice which has so long prevailed here, though never, so far as I can discover, passed upon directly by the court of last resort, where the objection was raised, seems to be a reasonable and convenient one, and ought now to be considered as settled." The court were unanimous in affirming the order. We ought to be equally unanimous in affirming the present order, whatever our opinion as to Sherwood's eligibility, for we cannot defeat the right that he has as citizen and elector because he also claimed another right which he has not; and least of all can we defeat the clear right of the people which stands wholly undefended.

And that brings me to my third proposition that we have no jurisdiction to consider or determine Sherwood's qualification for office, because that jurisdiction has been explicitly taken away from us, and this court has so deliberately decided. The Constitution provides (art. 3, sec. 10), "each house shall determine the rules of its own proceedings and be the judge of the elections, returns and *qualifications* of its own members." The meaning and the force of this provision has been carefully decided by this court. (*People ex rel. Hatzel* v. *Hall*, 80 N. Y. 121.) We there said that "it is conceded by the text writers that each of these houses has the *sole* power to judge thereof exclusive of every other tribunal," and we cited 1 Kent, 235; 1 Story on Const. § 833; Cooley Cons. Lim. 133. In further elucidation of the doctrine, we asserted and showed that it rested not merely upon the constitutional language, but upon the exigencies of free institutions, and respect for the independence of legislative bodies, whose authority emanates directly from the people. Kent says "there is no other body known to the Constitution to which such a power might be safely trusted." Coming down to the precise question involved, we said: "Though the Constitution confers upon specified

courts general judicial power, there are certain powers of a judicial nature which, by the express terms of the same instrument, are given to the legislative body, and among them this which we are considering. All powers are then in the hold of the people. They are about to distribute these powers among the bodies which they at the same time create. When it is said on such occasion to either house of the legislature — 'You are to be the judge of the election of members to your body,' — there is a specific conferment of this particular power; and when it is said at the same time to the judicial body — 'You are to have general jurisdiction in law and equity,' — though the conferment of power is general, there is by force of the concurrent action, *excepted from the general grant the* specific authority definitely bestowed with the same breath upon another body." And the court added : " The power thus given to the houses of the legislature is a judicial power, and each house acts in a judicial capacity when it exerts it. The express vesting of the judicial power, in a particular case so closely and vitally affecting the body to whom that power is given, *takes it out* of the general judicial power, which is at the same time in pursuance of a general plan that has regard in each part to every other part bestowed upon another body." I have quoted thus liberally from the opinion in the case cited, because it settled the law on that subject. I do not understand that anybody disputes the doctrine, or claims that we can directly adjudicate upon Sherwood's qualifications. I *do* understand the claim to be that we may do so indirectly, on the road to a judgment which we have jurisdiction to make : in other words, that we may transcend our jurisdiction on the way, when and as far and as often as we please, provided that, in the end, we render a judgment which we have a right to make : that we may exceed our jurisdiction and usurp that of another tribunal to obtain an unlawful reason for a judgment which we have a right to render; and that, because the jurisdiction we really *have* is invoked, we may assume in its aid a jurisdiction which we have *not*. I distrust the proposition; and especially in a case where, as in

this, the final judgment sought rests wholly and entirely upon the transcended jurisdiction, and where that judgment, however innocent in its form, is in truth in its entire substance and intended effect a direct and positive adjudication upon a subject-matter of which we have no jurisdiction. Where the difficulty lies in a want of jurisdiction over the subject-matter, no consent will give it, and no invocation break down the constitutional barriers. I cite for the present purpose but two authorities, because I deem them ample and sufficient. (*People ex rel.* v. *Mahaney*, 13 Mich. 481, and 56 N. Hamp. 577.) In the first of these cases the legislature had passed a police act for the city of Detroit, giving it immediate effect, which required a two-third vote. A quo warranto was issued to the newly appointed marshal which challenged his right to his office. The court had undoubted jurisdiction to issue the writ, and to render judgment of ouster upon it, and that jurisdiction was duly and regularly invoked, and, on the theory adopted here, that invocation authorized the court on the road to a judgment of ouster to rest upon reasons in excess of their jurisdiction, and in violation of the constitutional provisions. Just that they were asked to do, and just that they deliberately refused to do, upon the ground that it would transcend their jurisdiction. It was conceded that the journals and records of the legislature were regularly before the court and could properly be examined and considered. They showed that nine persons, necessary to make up the two-thirds, had voted for the bill, who held their seats in spite of the proven fact that they had not been elected at all, except by the soldier vote cast outside of the state under a law which had been decided to be unconstitutional. There was a claimed necessity to unseat legislators and establish the doctrine of invocation. But the court, led by an able constitutional lawyer, declined to do the wrong, although duly "invoked." Judge COOLEY said, after pointing out the same distribution of powers between the courts and the legislature which exists in this state: " It is sufficient for us to say that the Constitution has not conferred upon us this jurisdiction, and whether the decis-

ion made is right or wrong we shall leave it where it has been left by the fundamental law of the state."

The New Hampshire case was quite peculiar. A law of that state permits an application to the court for an opinion and advice upon legal questions submitted. The legislature made such application. They invoked the existing jurisdiction. The court had authority to receive and act upon the request and to give an answer. But the question put was whether certain senators had been lawfully summoned by the governor and council and properly admitted to their seats. If ever there was an "invocation," in the exercise of an admitted jurisdiction, to go beyond it, and usurp the rights of another tribunal on the road to an answer, it was this. But the court resisted the temptation and refused to answer, on the ground that they were not at liberty so to do, and added: "If a precedent of interference by one department with the discharge of its duties by another should be established by the form of a judicial decision a dangerous blow would in our judgment be struck at one of the most vital principles of our system of government."

Undoubtedly there is enough astuteness among us to suggest that these were cases where the legislature had acted. But what of that? If, on the road to a lawful decision, jurisdiction may be transcended at all, it may as well be done by an unlawful review as by an unlawful opinion in advance. I have found no cases to the contrary of those cited. The industry of the deputy attorney-general, ranging over every state in the Union, has found none except those which beg the entire question; since in every one cited by him, I think there was some existing law authorizing the court to adjudge upon the official title, or the election itself was a nullity, and there was not, as here, a constitutional prohibition against an exercise of the jurisdiction.

And so I deny the asserted doctrine of "invocation;" of a "right to do evil that good may come;" of excusable judicial usurpation; and if the doctrine has anywhere got its dangerous and destructive hold upon our law, which I do not believe, it

should be resolutely shaken off. But let us not deceive ourselves. The excess of jurisdiction is not even excusable, for it has neither occasion nor necessity. I have discussed that somewhat already, but may be permitted to add a few words more. The order to show cause and the affidavits of the petitioner raise no issue beyond that of the right of the state board to do anything more than count the votes and certify the result. He did not invoke either the consideration or decision of the question whether he was or was not duly elected to the office of senator ; and if the defendants had made no answer except to assert a right to consider extraneous papers, the issue of eligibility would not have been before the court, or involved in the jurisdiction invoked. It is clear that the petitioner on his part invoked no action or jurisdiction to which a ruling on his eligibility was essential or necessary. It made its first appearance in the answer of the state board. But it was no defense to them. It was no justification for their threatened action, and no answer to the demand upon them to perform their public duty. And so the issue of eligibility was not necessary and not even pertinent to the jurisdiction invoked on either hand, and has no excuse, that I can discover, for its presence in the case.

But here this discussion must end. If what I have said does not convince the majority of the court, nothing that I can say will do so. I have tried faithfully and, I hope, with proper respect, for certainly I have not meant to be wanting in that, to point out the mistake which, it seems to me, they are about to make. Theirs, however, must be both the responsibility and its consequences.

I think the order and judgment should be affirmed.

All concur with EARL, J., except FINCH, J., who reads for affirmance, and ANDREWS, J., concurring.

Orders reversed.